# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MONICA L. WELSH,

    Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

NO. CV 09-6509 AGR

**MEMORANDUM OPINION AND ORDER**

Monica Welsh ("Welsh") filed this action on September 8, 2009. Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge on September 21 and October 7, 2009. (Dkt. Nos. 6, 7.) On May 23, 2011, Welsh filed a Motion for Summary Judgment ("Motion"). On June 22, 2011, the Commissioner filed a Cross-Motion for Summary Judgment. The Court has taken the matter under submission without oral argument.

Having reviewed the entire file, the Court affirms the decision of the Commissioner.

///

///

///

**I.**

**PROCEDURAL BACKGROUND**

On May 18, 1999, Welsh filed an application for disability insurance benefits alleging a disability onset date of October 23, 1997. Administrative Record ("AR") 17. The application was denied initially and upon reconsideration. AR 44. Welsh requested a hearing before an Administrative Law Judge ("ALJ"). AR 44. On September 7, 2000, the ALJ conducted a hearing at which Welsh testified. AR 694-709. On September 26, 2000, the ALJ issued a decision denying benefits. AR 44-49. On November 25, 2005, the Appeals Council vacated the decision and remanded the case for additional development and proceedings, and a new decision. AR 17-18. On November 7, 2006, the ALJ conducted a hearing at which Welsh testified. AR 722-54. On February 23, 2007, the ALJ issued a decision denying benefits. AR 17-26. On July 30, 2009, the Appeals Council denied Welsh's request for review. AR 7-9. This action followed.

**II.**

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523. In determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257. When the

evidence is susceptible to more than one rational interpretation, the Court must defer to the Commissioner's decision. *Moncada*, 60 F.3d at 523.

## III.
## DISCUSSION

### A.  Disability

A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003).

### B.  The ALJ's Findings

The ALJ found that Welsh met the insured status requirements through September 30, 2002.  AR 18.

The ALJ found that Welsh had the following severe impairments: chronic fatigue syndrome, fibromyalgia and mood disorder.  AR 25.  Through the date last insured, the ALJ found Welsh had the residual functional capacity to perform light work involving simple and repetitive tasks, and no concentrated exposure to pulmonary irritants.  *Id*.  Welsh was unable to perform her past relevant work.  AR 17.  However, the ALJ concluded she was not disabled pursuant to Rule 202.21 of the medical-vocational guidelines (the "grids").  AR 24, 25.

### C.  Welsh's Credibility

Welsh argues the ALJ improperly rejected her testimony and statements that she felt well at times but constantly relapsed, had unrefreshed sleep, fatigue, weakness, "fogginess of the head," and memory loss, and slept for 14 to 18 hours a day.  (Motion at 2, 5, 7.)

///

///

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The ALJ found that Welsh's medically determinable impairments could reasonably be expected to cause her symptoms. AR 19.

"Second, if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (citations omitted). "In making a credibility determination, the ALJ 'must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.'" *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (citation omitted). "[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide specific, cogent reasons for the disbelief." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citations and quotation marks omitted). "The ALJ must cite the reasons why the claimant's testimony is unpersuasive." *Id.* (citation and quotation marks omitted). The ALJ may consider (a) inconsistencies or discrepancies in a claimant's statements; (b) inconsistencies between a claimant's statements and activities; (c) exaggerated complaints; and (d) an unexplained failure to seek treatment. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ found that Welsh "did not present as fully credible or reliable on basic matters." AR 20. He noted she initially testified that she had not been well enough to go on any trips after September of 2000 but later admitted that she had

4

joined her son on a field trip to Washington. AR 20, 725. She claimed that she did nothing during the trip but stay in her hotel. *Id.* The ALJ found Welsh's testimony was inconsistent with her contemporaneous report to her treating physician, Michael J. Goldberg, that she was "doing very well–just went with 200 kids on field trip to Washington." AR 20, 561.

The ALJ also noted Welsh did not respond "impressively" to his questions regarding the multiple entries in her treating records indicating she was doing very well, having better energy and good concentration. AR 20, 726-28, 734-35. Welsh at first denied she was doing very well and stated that her doctor "didn't say I was doing well. He said I was doing much better but I wasn't doing well." AR 726. After the ALJ quoted the treating records to her, she stated she would "constantly crash and relapse." *Id.* The ALJ could fairly conclude from Welsh's changing statements that she was not candid.

Welsh also changed her testimony regarding her involvement with her son's school activities, initially stating she was not involved in any of his activities and then stating she had attended two of his football games during the present and previous seasons. AR 20, 740.

The ALJ also found that evidence showed Welsh exaggerated the extent of her problems. AR 20. He noted that Welsh testified she would sleep up to 4 days continuously without eating but that no evidence showed weight loss. AR 20, 736. She also told an examining consultant that her physical problems essentially "quarantined" her in her house. However, she took trips, attended her son's football games and drove to medical appointments. AR 20, 491, 561, 725, 740, 743, 747.

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid" in weighing a claimant's credibility. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039,

(9th Cir. 2008) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.1996)). The record here supports the factual findings and conclusions of the ALJ.  AR 491, 561, 725-28, 734-36, 740, 743, 747.  The ALJ here properly rejected Welsh testimony because of inconsistencies between her testimony and statements contained in treatment notes, and inconsistencies between her statements and activities. *Thomas*, 278 F.3d at 958-59.  The ALJ's credibility finding is supported by substantial evidence.  "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.* at 959.  The ALJ did not err.

### D. Treating Physician

Welsh argues that the ALJ improperly rejected the opinions of her treating physician, Dr. Goldberg.

Dr. Goldberg provided his opinions in a letter dated April 6, 2006.  AR 607-12.  They were based on "detailed sophisticated medical and immunologic evaluations and physical examinations" and his treatment of Welsh since April 4, 2001.  AR 607.  He opined that Welsh suffered from Chronic Fatigue Syndrome ("CFS") and fibromyalgia.  AR 607, 608.  He wrote that Welsh reported symptoms of "fatigue, malaise, recurrent pharyngitis, chronic cystitis, cervical and inguinal adenopathy, arthralgia, lethargy, weakness, ear pressure with dizziness and nausea, fibromyalgia, metallic tastes in her mouth, blurred vision, tinnitus, twitching, muscle spasms and pain, difficulty with balance and gait, numbness, burning and tingling of the skin and low-grade fever."  AR 607.  He also noted she suffered from "dizziness, disabling headaches, fainting episodes [], photosensitivity, mental fogging, confusion, and an inability to think clearly or concentrate." *Id.*  He opined, "These symptoms have persisted since their onset [and], due to the degree of their severity, have rendered her totally disabled." *Id.*  He noted he saw Welsh every 4 to six weeks.  "While the severity of these symptoms do vary and have shown significant improvement with therapy, Ms.

Welsh still remains severely disabled." AR 607-08.  Dr. Goldberg also discussed CFS and fibromyalgia generally and explained how Welsh's symptoms showed she had both CFS and fibromyalgia.  AR 608-09.  Dr. Goldberg concluded that Welsh met the criteria for CFS and "is completely disabled for performance of even sedentary tasks and would not be able to perform even a sedentary job part time, on a regular, reliable schedule.  Currently she is not able to assume reliable work even over a short time period.  In addition, even the mildest form of exertion reduces her to bed rest.  I cannot imagine a job she would be capable of performing or an employer willing to live with so many limitations."  AR 610.

Dr. Goldberg rendered his opinions on April 6, 2006, more than 3-1/2 years after Welsh's date last insured.  AR 607.  It is not clear whether Dr. Goldberg's opinions pertain to Welsh's condition during the time period relevant here, i.e., from her alleged onset date of October 23, 1997, to her date last insured of September 30, 2002.  Also, Dr. Goldberg did not provide opinions as to Welsh's ability to perform specific work-related activities.

The ALJ discussed in detail Dr. Goldberg's treatment of Welsh from April 2001, when he began seeing her, to August of 2003, about a year after her date last insured.  AR 22-23.  He concluded that Dr. Goldberg's records "indicate that with medications, [Welsh] did well, not just better, and that this was the norm."  AR 23.  He rejected Dr. Goldberg's opinions "at least as pertains to the situation through September 30, 2002" because they were inconsistent with his own treatment notes.  *Id.*  "[H]is treating records, at least through September 30, 2002, simply do not reflect the scope or severity of symptoms which he lists."  *Id.*  The ALJ did not question that CFS and fibromyalgia could be disabling but concluded

///
///
///
///

7

that the "best evidence fails to establish that this was the case for [Welsh], at least through September 30, 2002."[1] *Id.*

An opinion of a treating physician is given more weight than the opinion of a non-treating physician. *Orn*, 495 F.3d at 631. When, as here, a treating physician's opinion is contradicted by another doctor,[2] "the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record. This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* at 632 (citations and quotation marks omitted). When the ALJ declines to give a treating physician's opinion controlling weight, the ALJ considers several factors, including the following: (1) the length of the treatment relationship and frequency of examination;[3] (2) the nature and extent of the treatment relationship;[4] (3) the amount of relevant evidence supporting the opinion and the quality of the explanation provided; (4) the consistency with the record as a whole; and (5) the specialty of the physician providing the opinion. *See Id.* at 631; 20 C.F.R. § 404.1527(d)(1)-(6). "When there is conflicting medical evidence, the Secretary must determine credibility and

---

[1] The ALJ also noted that Dr. Goldberg provided his opinions as an advocate 3-1/2 years after the date last insured. AR 23.
The ALJ did not comment regarding Dr. Goldberg's opinions as to Welsh's ability to work after September 30, 2002.

[2] Dr. Goldberg's opinions are contradicted by the opinions of consulting examining physician Kristof Siciarz, that Welsh had no functional limitations. AR 231-34.

[3] "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(i).

[4] "Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(d)(2)(ii).

8

resolve the conflict." *Thomas*, 278 F.3d at 956-57 (citation and quotation marks omitted).

Substantial evidence supports the ALJ's finding that Dr. Goldberg's treatment notes do not support his opinions as to Welsh's condition before September 30, 2002. The ALJ provided a detailed summary of Dr. Goldberg's treatment notes during that time. He noted, "Dr. Goldberg's entries essentially reflect [Welsh's] self-assessments of her conditions at various times," and that "even on this purely subjective basis, Dr. Goldberg's notes suggest that [Welsh] did much better than she now acknowledges in testimony and in responding to various SSA documents." AR 22.   He wrote,

> "[Welsh] initially presented to Dr. Goldberg with complaints of waking up tired and being tired all day long–but without mention of sleeping 14-18 hours a day, as was her testimony about her symptoms at that time. She also complained of digestive problems and chemical insensitivities. The initial entries were concerned with finding appropriate medications. By the end of April 2001, [Welsh] (i.e., through Dr. Goldberg) reported 'doing ok' on a specific medication, albeit still being very tired spacey, foggy and not mentally alert [AR 569-70]. The next entry describing more than the medication situation was in June 2001, when [Welsh] related having more short term memory loss. She reported sleeping better (except for in the last two weeks). She reported being able to better tolerate fumes. She reported still having body aches (especially when sleeping) and having decreased appetite and some gynecological concerns [AR 568]. In terms of mental status, July 2001 entry reflects that [Welsh] was feeling better since being on

Celexa, sleeping through the night, waking up refreshed, having bouts of energy and generally feeling fine [AR 567]. [Welsh] reported some complications after increasing the dosage of Celexa [AR 566], but was apparently doing better until October 2001, when she complained of being tired in the past week and other symptoms, and stated that her CFS symptoms were coming back [AR 565]. Her medication regimen was altered."

"In November 2001, [Welsh] reported having some fibromyalgic right arm pain, digestive problems, chemical sensitivity (less) and short-term memory problems. However, she related that her energy level was good, that she was able to concentrate better, had no more body aches, was sleeping really well and was waking up refreshed [AR 564]. She did not report an exacerbation until January 2002, but then reported a good response to Kutapressin [AR 562].

"As noted above, in March 2002, [Welsh] reported doing very well and taking a field trip to Washington [AR 561]. The next detailed entry, May 2002, reflects [Welsh's] complaint of bloating for about one month, but only a 'little bit of fatigue + body aches'. She also reported good concentration, sleeping well and waking up refreshed. [AR 560]. This is followed by June 2002 entry that she was still sleeping well, having good concentration, good memory and was doing fine, save for having little pain in the throat and noting a little blood in her bowels [AR 559]. Similar statements were made in July 2002 [AR 558] and September 2002 [AR 557].

>The latter is the last detailed entry through the date last insured. [Welsh] then reported better energy, better digestion, good memory, good concentration, brain-clear complaining only of morning pain in the feet and intermittent stomach pain [AR 557].
>
>"The entries are essentially similar until August 2003, when [Welsh,] then off of Kutapressin, reported that fibromyalgia was coming back, albeit less intense, but still reported that she [was] doing OK overall [AR 551].

AR 22-23. The ALJ accurately summarized Dr. Goldberg's treatment notes. AR 551-70. "[A]t least through September 30, 2002, [the treatment notes] simply do not reflect the scope or severity of symptoms" listed and opined by Dr. Goldberg and showed that Welsh "did well, not just better," with her medications. AR 23, 551-70. *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004) (ALJ's findings must be upheld "if supported by inferences reasonably drawn from the record"); *Macri v. Chater*, 93 F.3d 540, 543-544 (9th Cir. 1996) (ALJ is entitled to draw inferences logically flowing from the evidence). The ALJ did not err. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (ALJ may reject opinion of treating physician if it is unsupported by treatment notes); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (same).

### E. Examining Physicians

Welsh also appears to argue that the ALJ improperly relied on the opinions of consultative evaluators to reject Dr. Goldberg's opinions. (Motion at 7.)

A review of the ALJ's decision shows that he briefly summarized the report and opinions of consultative evaluator Kristof Siciarz. AR 21, 231-34. However, contrary to Welsh's assertion, the ALJ did not rely on Dr. Siciarz's report or opinions to reject Dr. Goldberg's opinions. AR 17-26.

11

### F. <u>Fatigue</u>

Welsh argues that the ALJ erroneously failed to consider the effects of fatigue on her ability to sustain work activity. (Motion at 7-8.)

The ALJ found Welsh suffered from CFS. AR 19, 25. His discussion of Welsh's testimony and the medical evidence clearly show he considered her fatigue. AR 19-24. In reaching his residual functional capacity findings, he "allow[ed] that [her] symptoms would likely have exacerbated with strenuous activity." AR 23. Contrary to Welsh's assertion, the ALJ considered the effects of fatigue. The ALJ did not err.

### G. <u>Reliance on the Grids</u>

Welsh argues that the ALJ improperly relied on the Medical-Vocational Guidelines (the "Grids") to find her not disabled. (Motion at 8-9.) She argues the grids were not applicable here because she suffered from "fatigue, weakness, and mood swings."

When the Grids do not match a claimant's residual functional capacity, age, work experience and education, i.e., when a claimant has non-exertional impairments, "the ALJ can either (1) use the grids as a framework and make a determination of what work exists that the claimant can perform, [citation], or (2) rely on a vocational expert when the claimant has significant non-exertional limitations." *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007) (citing SSR 83-14 and *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 577 (9th Cir.1988). Vocational expert testimony is required only when a non-exertional limitation is "sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitation." *Hoopai*, 499 F3d at 1076 (citation and quotation marks omitted). When nonexertional limitations do not limit significantly the range of work permitted by the claimant's exertional limitations, use of the Grids is appropriate. *Desrosiers*, 846 F.2d at 577; *Razey v.*

1 *Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983).

Here, Plaintiff had non-exertional limitations limiting her to work involving simple and repetitive tasks and no exposure to pulmonary irritants. AR 25. Welsh does not allege and has not shown that her "fatigue, weakness, and mood swings" resulted in limitations beyond those found by the ALJ. The ALJ properly found that Welsh's nonexertional limitations had little impact on the occupation base of unskilled light work. AR 24. *See* 20 C.F.R. pt. 404 subpt. P, app. 2, § 202.00(b) (approximately 1,600 separate sedentary and light unskilled occupations in the national economy); SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions....;" and "restriction to avoid excessive amounts of noise dust, etc." would have minimal impact on the broad world of work "because most job environments do not involve great noise, amounts of dust, etc."). Accordingly, because Welsh's nonexertional limitations did not significantly limit the range of work permitted by her exertional limitation to light work, the ALJ properly applied the Grids. *Desrosiers*, 846 F.2d at 577; *Razey*, 785 F.2d at 1430; *Odle*, 707 F.2d at 440. The ALJ did not err.

## IV.
## ORDER

IT IS HEREBY ORDERED that the decision of the Commissioner is affirmed.

DATED: August 22, 2011

ALICIA G. ROSENBERG
United States Magistrate Judge

13